IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 2:16cr542-MHT-SRW |
| | ) | |
| DARRIUS MARCEL MASTIN | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

This case is before the court on defendant Darrius Mastin's motion to suppress (Doc. 57), and the government's response (Doc. 61). The court held an evidentiary hearing on the motion on December 5, 2017. For the reasons discussed below, the court finds that the motion to suppress is due to be denied.

### FACTS

On January 19, 2016, Magistrate Jonathan Davis of the District Court of Montgomery, Alabama, found probable cause to arrest Trudyo[1] Hines and Taboris Mock on the charge of first degree robbery pursuant to Ala. Code §13A-8-41(a)(1). Magistrate Davis signed arrest warrants for both individuals. Government's Ex. 1, 2. According to a memorandum prepared on January 21, 2016, by Sgt. Kevin Byrd, a Montgomery Police Department ("MPD") Officer and a member of the United States Marshals' Gulf Coast Regional Task Force (the "Task Force"), the robbery charges arose out of a 2:00 a.m. robbery and assault by Hines and Mock on a male victim at Club Big Boyz in Montgomery

---

[1] The arrest warrant uses the spelling, "Truduo"; however, in a contemporaneous memorandum (Defendant's Exhibit 13), the case agent uses "Trudyo." The court adopts the second spelling, which it believes to be correct, for purposes of this Recommendation.

on Sunday, January 17, 2016, during which the men stole approximately $3,000 in jewelry. *See* Defendant's Exhibit 13 at 1. Sgt. Byrd testified at the suppression hearing in this case that there were no personal injuries in the robbery, but handguns were used. According to the memorandum, Hines and Mock were identified as known members of a local street gang known as "'DOA'/Dope Boys of America," and the victim is a member of "the 'Blood' street gang." *Id*. The memorandum indicates that Hines and Mock were also wanted for questioning "in reference to a homicide" that occurred in Montgomery on January 18, 2016, which "stemmed from the original robbery." *Id*.

Sgt. Byrd received copies of the arrest warrants from the MPD on January 19, 2016 for execution. The Task Force, comprised of officers from a number of different agencies, is responsible for finding and arresting violent fugitives based on warrants transmitted by local jurisdictions. In this case, Task Force officers reviewed web-based databases and attempted to identify current locations for Hines and Mock. They also interviewed family members and friends, and spoke with several confidential sources to determine where Hines and Mock could be found. Officers learned that both Hines and Mock, who were known associates, frequented hotels in the city of Montgomery. In Sgt. Byrd's experience,[2] wanted individuals can often be found at hotels and motels, where they are not usually checked in under their own names, but under the name of a girlfriend, relative, or someone

---

[2] When Sgt. Byrd testified in December 2017, he had been with the MPD for more than 22 years, and had been assigned to the Task Force for approximately three years.

else willing to obtain a room for them. Sgt. Byrd anticipated that Hines and Mock might be found together.

On January 19, 2016, members of the Task Force and the MPD's "Security Threat Group," *see* Defendant's Ex. 13,[3] began to search hotels in Montgomery. They knew that Hines' girlfriend was Nakita Rogers, and they took pictures of Hines, Mock and Rogers with them. After checking numerous hotels, officers traveled to the Country Inn and Suites on Carmichael Road late in the evening where they found that Nakita Rogers had rented a room (room 311). Officers confirmed this by showing the picture of Rogers to the desk clerk, determining from the clerk that although Rogers was alone when she paid for the room, there was at least one other individual in her vehicle, a silver SUV.

The Task Force sent a plain clothes undercover officer to the third floor of the hotel to walk by room 311, but he or she could not hear any noise coming from the room. Sgt. Byrd concluded that either there was nobody in the room, or someone was possibly sleeping there. Officers then set up surveillance from several of their vehicles, which were in radio contact with each other, in the parking lot of the hotel and on Carmichael Road. Sometime around 12:30 am, the officers saw a silver SUV pull into the parking lot, along with a white Ford Expedition and a small black car. All three vehicles parked on the left side of the hotel together, and officers observed three black females and three black males getting out. The three men stood around the cars while the three females entered the hotel from the side entrance. Viewing the men from the Task Force vehicles at a distance of

---

[3] During Sgt. Byrd's testimony, this group was also referred to as the "MPD gang unit."

some 80 to 100 yards away, and without being able to make out faces clearly at night, officers believed that the men generally matched descriptions of Hines and Mock based on their physical characteristics, including race, height and weight.[4]

Officers saw the three females go to front desk, where they remained for three to five minutes. One of the women appeared to be Rogers. The females left the front desk and walked back down the main corridor of the hotel on the first floor. Officers contacted the front desk by telephone, and the desk clerk confirmed that one of the women was Rogers. Meanwhile, the males stood at the vehicles for a few seconds after the women left, then went into the side entrance of the hotel.

The officers discussed an "operation plan" to attempt to make contact with these individuals. *Id*. at 2. They intended to determine first if the group actually had gone into room 311 by doing another "walk by" to listen for noise coming from the room. However, before the officers could act, two of the males and one female came out of the side entrance to the hotel and got into the Expedition, backed out, and began to drive toward the exit. Sgt. Byrd believed that the males "could have been either [Hines or Mock], or it could have been both." According to him, the officers "knew that half of the people were possibly still in the hotel room and half of the people were in the vehicle. We didn't know if Taboris Mock or Trudyo Hines were in the vehicle or if they were still in the hotel room, so we had to make a decision as to which way we wanted to go." The officers decided that part of the

---

[4] Hines and Mock were also black males. As the defendant showed, they differed to some extent from the defendant and from each other in height, weight, and complexion – but not to an extent that would render the officers' perception of a match unreasonable.

team would conduct a traffic stop on the Expedition, while the others would go up to the hotel room. They wanted to do this simultaneously so that half of the group could not tip the others off and enable them to flee; accordingly, the officers who were following the vehicle gave the other officers time to get to the hotel room before initiating the traffic stop.

Some five to eight officers went up to the third floor and approached room 311.  As they arrived, they saw that the door was not fully closed; it was open approximately one to two inches. The officers could hear both male and female voices inside the room. As the officers set up in front, defendant Darrius Mastin opened the door. His hands were in the pocket of his jacket or hoodie. Officers immediately ordered defendant to take his hands out of his jacket, place them over his head, and lie face down on the ground. They recognized Nakita Rogers directly behind the defendant in the doorway, halfway in the hall of the room and halfway in the bathroom, and gave her the same order. They also saw a third person (later identified as Nakita Rogers' sister, Sabrina Rogers) standing behind the door of the hotel room and told her to do the same. The officers ordered everyone to the ground with their hands up so they could determine that nobody was holding a firearm and limit the individuals' mobility.

Officers did not recognize the defendant, but they knew immediately that he was not Mock or Hines. The officers remained in the hallway of the hotel and ordered all three individuals to crawl to their position. Defendant, who was closest to the door, came out first on his hands and knees. As he crossed the threshold of the hotel room, a black semiautomatic handgun (later identified as a Para 9mm handgun) fell out of his waistband directly underneath him, onto the floor of the hallway. One of the Task Force officers,

Deputy U.S. Marshal David Onafry, yelled "gun," reached up with his foot, stepped on the gun and pulled it out of the reach of the defendant. Defendant was taken into custody to secure him for officer safety, and the gun was seized.[5] After defendant was detained, the two females were also ordered to crawl out into the hallway and secured.

Task force officers then entered room 311 to make sure no other individuals were present. Because the officers "saw Nakita Rogers in there, which is a known associate of Trudyo Hines," they thought it was "possible that somebody else could be hiding in that room and somebody else could be armed." Sgt. Byrd testified, "I don't know who else could be in the room. Somebody could have been in that room before I ever got there. Mr. Hines could have been asleep in the bed before I ever got there." When Sgt. Byrd entered the room and looked behind the door, he saw a pink-handled firearm and a chrome firearm in an open black purse on a chair. *See* Defendant's Ex. 13 at 2. He told other officers that the firearms were present and continued to clear the room. Toward the rear of the room Sgt. Byrd observed the handle of a silver and black semi-automatic handgun inside a second purse that was sitting on the counter on the left side of the room. *Id*. He again notified the other officers of the location of the firearm. *Id*. After the officers completed their search for other individuals in the room, and found no one else present, Sgt. Byrd was notified by another officer that Hines had been taken into custody in the white Expedition. *Id*. The officer indicated that Hines had been found in possession of a Ruger P90 45 caliber

---

[5] Sgt. Byrd did not know whether or not Marshal Onafry took the handgun it and secured it at that point or not. Sgt. Byrd said that he himself did not pick it up then. However, the gun was clearly secured by one of the officers.

firearm with an extended magazine, and the driver had been armed with a Glock 9mm semi-automatic handgun, although the latter had a license to carry the weapon. *Id*.

At that time, Sgt. Byrd began to identify the other occupants of the hotel room. Defendant was found through a computer check – run, according to Sgt. Byrd, "for warrants and to make sure he was not wanted" – to have been convicted of first degree robbery in 2010 and to be on probation. *Id*. The two females were also identified, and Sgt. Byrd learned that they had licenses to carry the weapons found in the room. *Id*. Sgt. Byrd then advised a detective with the Criminal Investigation Division (CID) of the MPD that Hines was in custody, and told him about the identities of the other occupants of the room and the firearms. *Id*. The detective requested that all three be transported to the CID for questioning in light of the homicide the day before which allegedly was connected to the robbery, and requested that the firearms be collected for safekeeping. *Id*. Officers asked Nakita Rogers for permission to search the room, and she refused. All three individuals were taken to the CID.

Officers continued to search for Taboris Mock. After interviewing several of his family members, and learning that Mock had been staying with his girlfriend at various hotels and friends' houses, officers continued to search hotels in the Montgomery area. They learned that Mock's girlfriend, Deshre Benson, had rented a room at the Roadway Inn on Troy Highway. *Id*. They knocked on the door of the room, and took Mock into custody at approximately 5:30 am.

## DISCUSSION

### 1.  Introduction

Defendant contends that defendant's handgun was seized without a warrant in violation of the Fourth Amendment to the United States Constitution, which protects the "right of the people to be secure in their persons, houses, papers, *and effects,* against unreasonable searches and seizures." *United States v. Place*, 462 U.S. 696, 700 (1983). *See generally* Doc. 57. He also contends, at least implicitly, that he was detained in violation of the Fourth Amendment. *See California v. Hodari D.,* 499 U.S. 621, 624 (1991) ("We have long understood that the Fourth Amendment's protection against 'unreasonable … seizures' includes seizure of the person[.]"). In addition, at the suppression hearing in this case, defendant challenged the lawfulness of two statements that he gave to officers after the weapon was seized and he was detained.

### 2.  Expectation of Privacy

The court begins by observing that the weapon possessed by defendant was not discovered by officers as the result of a search, either of defendant's person or of Nakita Rogers' hotel room. Instead, the officers observed the weapon when it fell from defendant's waistband to the floor of a public corridor at the Country Inn and Suites hotel. There is no question that the officers were lawfully present in the hotel corridor outside Rogers' room when the weapon was observed and seized. Nothing before the court suggests that the third floor hallway of the Country Inn and Suites was anything other than a public hallway, and defendant has neither argued, nor produced any evidence to establish, that he had a reasonable expectation of privacy in the hotel corridor. *See United States v. Roby*, 122 F.3d

1120, 1125 (8th Cir. 1997) (Defendant "had an expectation of privacy in his Hampton Inn hotel room. But because the corridor outside that room is traversed by many people, his reasonable privacy expectation does not extend so far. Neither those who stroll the corridor nor a sniff dog needs a warrant for such a trip."); *Marullo v. United States*, 328 F.2d 361, 363 (5th Cir. 1964) ("a transient occupant of a motel must share corridors, sidewalks, yards, and trees with the other occupants. Granted that a tenant has standing to protect the room he occupies, there is nevertheless an element of public or shared property in motel surroundings that is entirely lacking in the enjoyment of one's home."); *cf. United States v. Miravalles*, 280 F.3d 1328, 1333 (11th Cir. 2002) (Tenants in a high-rise apartment building which was "open and accessible not only to all the many tenants and their visitors, to the landlord and all its employees, to workers of various types, and to delivery people of all kinds, but also to the public at large" did not have a reasonable expectation of privacy in the common areas of their building.); *United States v. Maestas*, 639 F.3d 1032, 1038 (10th Cir. 2011) ("In general, most circuit courts have found that 'shared' or 'common' areas in apartment complexes or multi-unit dwellings, such as hallways, entryways, and basements, are not areas over which an individual tenant can have a reasonable expectation of privacy."). Further, in this case, defendant did not establish a reasonable expectation of privacy in the hotel room itself, such that the question of whether the adjacent hallway could be considered the curtilage of that room might even arise. The room was paid for and registered to Nakita Rogers, and nothing before the court indicates that defendant – whose presence was not made known to hotel management, and who was not observed to carry a suitcase or bag into the hotel or to have any obvious personal belongings in the room – was

even an overnight guest.[6] *See U.S. v. Cooper*, 203 F. 3d 1279, 1284 (11th Cir. 2000) ("To determine whether an individual has a reasonable expectation of privacy in a hotel room, courts have looked to such indicia as whether the individual paid and/or registered for the room or whether the individual's personal belongings were found in the room.").

### 3. Initial Seizure of the Defendant

However, even though the officers were lawfully present in the hotel corridor, the court still must examine whether – when they observed defendant standing at the partially open door of Rogers' hotel room – they were constitutionally permitted to order defendant to take his hands out of his jacket, place them over his head, and crawl out of the doorway of the room, effecting a brief seizure of his person. *See United States v. Mendenhall*, 446 U.S. 544, 553-554 (1980) ("a person is 'seized' … when, by means of physical force or a show of authority, his freedom of movement is restrained. … Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.); *West v. Davis*, 767 F.3d 1063, 1070 (11th Cir. 2014) ("'[t]he Fourth Amendment applies to all seizures of

---

[6] Defendant maintained at the suppression hearing that the occupants of the hotel room, including the defendant, "were all there lawfully as guests. … They're spending time at the hotel." However, defendant produced no evidence to this effect. *See United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008) ("The accused bears the burden of demonstrating a legitimate expectation of privacy in the area searched.").

the person, including seizures that involve only a brief detention short of traditional arrest.'") (citation omitted).

### A. *Terry* Stop

The United States contends in its response to the motion to suppress (Doc. 61 at 3-4) – and argued at the suppression hearing itself – that defendant's seizure is properly analyzed as a *Terry* stop. *See Terry v. Ohio,* 392 U.S. 1 (1968). To effect a lawful *Terry* stop, officers must, under the totality of the circumstances, and based on the collective knowledge of the officers involved, have an objectively reasonable suspicion that defendant had engaged, or was about to engage, in a crime. *United States v. Acosta*, 363 F.3d 1141, 1144-45 (11th Cir. 2004). The burden of proof on a motion to suppress relating to the reasonableness of warrantless seizure rests with the prosecution; "[t]he Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the fourth amendment." *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983).

In this case, the court finds that the United States has failed to meet its burden under *Terry* as to the initial seizure of the defendant. When the officers first observed the defendant – who, according to Officer Byrd, "was standing there kind of surprised that we were at the door" – they immediately were aware that he was neither Mock nor Hines, and therefore was not the subject of either of their arrest warrants. No suspicious odor emanated from the hotel room, and defendant had no drugs in his possession, nor does the government contend that officers believed drugs to be present in the room. Officers had not received a tip from any informant concerning the defendant, and they were not

responding to a complaint from the hotel or anyone else. Further, no evidence before the court suggests that the hotel room was in a high crime area, that defendant exhibited nervous or evasive behavior, or that he had embarked on unprovoked flight. Nor did the officers cite any objective reason to believe that defendant himself was a gang member, or that he might have been an accomplice to the robbery a few days before that had occasioned the arrest warrants, or that he might have been engaged in receiving or fencing the property that was stolen. Also, Officer Byrd made no allegation at the suppression hearing that defendant possibly had been stationed as a lookout at the hotel door, or that he was otherwise assisting Hines or Mock to elude arrest. Indeed, Byrd testified, in response to questioning at the hearing, that there was no criminal activity going on in the hotel room that he knew of. At most, as far as the officers were aware at the point that they encountered the defendant, he was simply in the process of exiting a hotel room occupied by the girlfriend of a wanted individual, at a time when that individual, or his associate, might or might not also have been present in the room. If officers suspected any specific criminal activity to be afoot in which defendant himself was involved, they have wholly failed to inform the court what that activity might have been.

The court is aware that some jurisdictions have concluded that police need not have a particularized suspicion of any specific crime to conclude that they have reasonable suspicion to conduct a *Terry* stop. *See, e.g.*, *United States v. Guardado*, 699 F.3d 1220, 1225 (10th Cir. 2012) ("Direct evidence of a specific, particular crime is unnecessary" for reasonable suspicion.); *United States v. Gatamba*, 419 F. App'x 529, 532 (5th Cir. 2011) (detention was lawful because officer "had particularized facts supporting a finding that

*some* criminal activity might be afoot. … [W]e do not require "the police to articulate particularized facts that support a finding that a *particular specific crime* is afoot.") (citation omitted) (emphasis in original); *United States v. Pack,* 612 F.3d 341, 355-56 (5th Cir. 2010), *opinion modified on denial of reh'g,* 622 F.3d 383 (5th Cir. 2010) (concluding that police need not have a "particularized suspicion of a specific crime," and noting that the Supreme Court "has often spoken of the wrongdoing itself in general terms") (citations omitted); *United States v. Fields*, 2014 WL 5147610, at *4 (W.D. Mo. Sep. 10, 2014), *report and recommendation adopted*, 2014 WL 5171951 (W.D. Mo. Oct. 14, 2014), *aff'd,* 832 F.3d 831 (8th Cir. 2016) (Officers "need not be able to identify the specific crime the officer is investigating; rather[,] the officer need only reasonably suspect that the individual is engaged in some kind of criminal activity.") (citations omitted); *Mocek v. City of Albuquerque*, 3 F. Supp. 3d 1002, 1078 (D. N.M. 2014), *aff'd,* 813 F.3d 912 (10th Cir. 2015) ("For reasonable suspicion to exist, officers are not required to observe the equivalent of direct evidence of a particular specific crime as long as there is reasonable suspicion of criminal activity. … Likewise, to establish that reasonable suspicion exists, officers have no obligation to articulate a specific offense which they believe the suspect may have committed.") (citations and internal marks omitted); *Tom v. Voida*, 1991 WL 343377, *4 (S.D. Ind. May 3, 1991), *aff'd,* 963 F.2d 952 (7th Cir. 1992) ("the law only requires that the officer have specific and articulable facts giving rise to reasonable suspicion of criminal activity, not a specific crime.").

However, to this court's knowledge, neither the Supreme Court nor the Eleventh Circuit has itself directly held that it is constitutionally sufficient for officers to articulate

facts which support only a reasonable suspicion of general criminality. *See* 4 W. LaFave, *Search & Seizure* § 9.5(c) (5th ed. 2012) (Noting that "the Supreme Court has never expressly ruled on" the question of "whether the available information must support a conclusion that there is reasonable suspicion of a particular offense …, or whether it should suffice that there is reasonable suspicion of criminality generally" – and that "the lower courts are divided on the issue."). Also, even if the United States need not always specify the particular criminal activity reasonably suspected by officers to be afoot, it is clear, at a minimum, that many courts have considered the government's failure to point to suspicion of a specific crime significant in evaluating the totality of the circumstances. *See, e.g.*, *United States v. Campbell*, 741 F.3d 251, 261 (1st Cir. 2013) ("A warrantless traffic stop satisfies the Fourth Amendment's reasonableness requirement … if 'police officers have a reasonable suspicion of wrongdoing—a suspicion that finds expression in specific, articulable reasons for believing that a person may be connected to the commission of *a particular crime*.'") (quoting *United States v. Lee*, 317 F.3d 26, 31 (1st Cir. 2003)) (emphasis added); *United States v. See*, 574 F.3d 309, 314 (6th Cir. 2009) (fact that officer "did not suspect the men of a specific crime" was a factor in concluding that, in the totality of the circumstances, the officer did not have reasonable suspicion that criminal activity was occurring.); *Johnson v. Campbell*, 332 F.3d 199, 210 (3d Cir. 2003) (fact that officer "has not enunciated a logical series of inferences that would lead a reasonable person to believe that [defendant] was about to undertake a specific crime" was significant in totality of circumstances analysis.); *Duran v. City of Douglas, Ariz.,* 904 F.2d 1372, 1378 (9th Cir. 1990) ("No matter how peculiar, abrasive, unruly or distasteful a person's conduct may be,

it cannot justify a police stop unless it suggests that some specific crime has been, or is about to be, committed, or that there is an imminent danger to persons or property. Were the law any different – were police free to detain and question people based only on their hunch that something may be amiss – we would hardly have a need for the hundreds of founded suspicion cases the federal courts decide every year, for we would be living in a police state where law enforcement officers, not the courts, would determine who gets stopped and when."); *United States v. Gallinger*, 227 F. Supp. 3d 1163, 1170 (D. Idaho 2017) (Officer "had no particular information that criminal activity was actually afoot and nothing to link [defendant] to the possible criminal activity, aside from his location in the vicinity of the 911 call location. … [T]hese bare facts do not amount to reasonable suspicion that [defendant] was involved in criminal activity."); *United States v. Dixon*, 157 F. Supp. 3d 1025, 1030 (D. Kan. 2016) (fact that "[w]hen the officer seized the occupants of the car, he did not suspect the men of a specific crime" mitigated against reasonable suspicion under the totality of the circumstances); *Amili v. City of Tukwila*, 31 F. Supp. 3d 1274, 1282–83 (W.D. Wash. 2014) (a person conduct "cannot justify a police stop unless it suggests that some specific crime has been, or is about to be, committed, or that there is an imminent danger to persons or property.") (citation omitted); *Martiszus v. Washington Cty.*, 325 F. Supp. 2d 1160, 1170 (D. Or. 2004) (Sheriff conceded he could not "'piece together any facts about [defendant's] conduct … that would tie to any specific crime.'") (citation omitted).

Thus, in the absence of controlling precedent in the Supreme Court or the Eleventh Circuit to the contrary, this court has weighed the lack of articulable, objective facts

supporting a reasonable suspicion that defendant was involved in any specific criminal activity when he was initially seized as one factor in assessing the totality of the circumstances in this case. *See Campbell*, 332 F.3d at 210 ("The availability of objective facts justifying a seizure is of paramount importance. As the Supreme Court has emphasized, the 'demand for specificity in the information upon which police action is predicated is the central teaching of ... Fourth Amendment jurisprudence.'") (citing *U.S. v. Cortez,* 449 U.S. 411, 418 (1981)). But the court has not relied exclusively on the absence of suspicion of a particular crime. It finds, in addition, based on the totality of all the circumstances, that under the *Terry* standard, the government has not put forward a minimal level of objective manifestation – other than defendant's possible proximity to one or more persons having outstanding robbery warrants – upon which officers could base a reasonable suspicion that defendant himself was, or was about to be, engaged generally in any criminal activity at all. Proximity to a wanted individual is simply insufficient to meet the reasonable suspicion standard. *See Family Serv. Ass'n ex rel. Coil v. Wells Twp.,* 783 F.3d 600, 605 (6th Cir. 2015) ("'[M]ere propinquity to others independently suspected of criminal activity does not, without more,' support a *Terry* stop or a seizure.") (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91–93 (1979)); *Matz v. Klotka*, 769 F.3d 517, 523 (7th Cir. 2014) ("We have recognized that simply being in the presence of others who are themselves suspected of criminal activity is insufficient standing alone to establish particularized suspicion for a *Terry* stop and frisk."). *See also Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) ("While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the

Fourth Amendment requires at least a minimal level of objective justification for making the stop.") (citation omitted); *Cortez*, 449 U.S. 411 at 417 ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.") (citations omitted).

### B.  Seizure for Officer Safety During Attempt to Serve Arrest Warrants

This holding, however, is not fatal to the United States' attempt to justify the officers' initial seizure of the defendant. Although the court does not find this seizure permissible under *Terry*, another body of Fourth Amendment case law must be considered. In this case, officers were in the process of preparing to attempt to serve lawful arrest warrants, supported by probable cause, on Mock and/or Hines at the time that they encountered the defendant. "[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York,* 445 U.S. 573, 603 (1980). Under *Payton,* "in order for law enforcement officials to enter a residence to execute an arrest warrant for a resident of the premises, the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry." *United States v. Magluta*, 44 F.3d 1530, 1535 (11th Cir. 1995); *see also United States v. Williams*, 871 F.3d 1197, 1201 (11th Cir. 2017). The *Payton* warrant requirement also applies to guest rooms in commercial establishments, such as hotels. *See United States v. Carrion*, 809 F.2d 1120, 1127–28 (5th Cir. 1987) (footnote omitted) (citing *United States v. Baldacchino,* 762 F.2d

170, 175–76 (1st Cir. 1985); *United States v. Newbern,* 731 F.2d 744, 748 (11th Cir. 1984); and *United States v. Jones,* 696 F.2d 479, 486–87 (7th Cir. 1982)). "Neither *Payton* nor this court's Fourth Amendment jurisprudence requires law enforcement officers to be absolutely certain that a suspect is at home before entering a residence to execute an arrest warrant." *Magluta,* 44 F.3d at 1538.

Applying the first part of the *Payton* test, the court relies on "common sense factors" to determine whether the arresting officers harbored a reasonable belief that either Meeks or Hines was residing in Rogers' hotel room. *Id*. at 1535. In the instant case, on January 19, 2016, the officers knew that (1) earlier on that same day, a Montgomery, Alabama, district court judge had found probable cause to believe that both defendants had been involved in a first degree robbery on January 17, 2016, at Club Big Boys in Montgomery; (2) a homicide had occurred on the following day (January 18, 2016) which officers believed to be related to the robbery; (3) interviews with family, friends, and confidential sources had revealed that Mock and Hines, who were known associates, frequented hotels in the city; (4) suspects who did not wish to be apprehended usually did not use their own names to register at hotels, but often used the name of a girlfriend or someone else to get them a room; (5) Hines' girlfriend's name was Nakita Rogers; (6) a Nakita Rogers had rented a room at the Country Inn and Suites hotel; (7) the desk clerk at the Country Inn and Suites hotel had confirmed, after viewing a photograph shown to him or her by the officers, that the guest named Nakita Rogers was, in fact, the person whom officers had identified as Hines' girlfriend; and (8) the desk clerk had indicated that at the time Rogers had registered and paid for the room, there was at least one other individual in her vehicle (a

silver SUV) along with her. The court concludes that this information was sufficient for the officers to form a reasonable belief that Hines (or possibly both Mock and Hines) was staying in Rogers' hotel room.

As to the second part of the *Payton* test, the officers also had a reasonable belief that either Hines or Mock, or possibly both, was present in Rogers' hotel room at the time they were preparing to enter. Around 12:30 a.m., the officers conducting surveillance in the parking lot of the hotel observed a silver SUV pull up along with a white Ford Expedition and a small black car; they saw three black females and three black males get out of the vehicles; from a distance of 80 to 100 yards, and under the constraints of nighttime visibility, they believed that the three males – whose faces were not visible at that distance, who were not standing in a well-lit area, and who were dressed in what Officer Byrd described as "thick," "bulky," "baggy" clothing, such as jackets and hoodies – generally matched the description of Hines and Mock; they saw the three females, one of whom appeared to be Rogers, approach the front desk; they phoned the front desk and confirmed that one of the females had indeed been Rogers; they saw the three males enter the hotel through the side entrance; they decided to approach the individuals in the hotel rather than in the open area of the parking lot to avoid the risk of the individuals' fleeing in different directions, and the possibility that, if they were armed, they could fire at officers or take someone in a nearby restaurant hostage; while the officers prepared to go to Rogers' hotel room, two of the males and one female came back out of the side entrance of the hotel, got into the Expedition, and left the parking lot; the officers believed that the two males could have been Hines and Mock, but also believed that the remaining male could have been

Hines or Mock; the officers decided that one part of their group would attempt to stop the vehicle while the others approached the hotel room, and that they would act simultaneously so that those in the hotel room could not tip off those in the Expedition, or *vice versa*; the officers who approached the hotel room could hear both male and female voices in the room; while the officers were setting up in the hallway, the door came partly open and the officers saw defendant in the doorway with his hands in his pocket; officers observed that Rogers was in the room directly behind the defendant, and another occupant was also in the room; and, while the officers knew immediately that the defendant was not Hines or Mock, they did not know with certainty how many people would be in the room, or whether another person might have come in earlier. As noted above, law enforcement officers are not constitutionally required to be absolutely certain that a suspect is present before entering to execute an arrest warrant; a reasonable belief is sufficient. *See Magluta*, 44 F.3d at 1538. The court concludes that the arresting officers, who had a reasonable belief that Hines and/or Mock was staying in the room, also held a reasonable belief that Hines or Mock was present at the time they encountered the defendant, under "the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality[.]" *Id*. at 1535.

Given that the officers had the authority to enter the hotel room to attempt to serve one or more arrest warrants supported by probable cause, they also had the authority, while they attempted to execute the warrants, to establish control of and secure the premises, both inside and immediately outside the room. This authority – which was sufficient to permit officers to seize the defendant briefly by causing him to take his hands out of his pockets,

place them over his head, and crawl out of the doorway of the room into the hall – follows

from *Payton* itself, as well as the Supreme Court's ruling in *Michigan v. Summers*, 452

U.S. 692, 705 (1981), and the Eleventh Circuit's interpretation of these decisions. The rule

established in *Payton* was premised on the idea that "an arrest warrant founded on probable

cause implicitly carrie[d] with it the limited authority to enter a dwelling in which the

suspect live[d] when there [wa]s reason to believe [that] the suspect [wa]s within." *Payton,*

445 U.S. at 603. In *Summers*, the Supreme Court took this reasoning a step further, holding

that "a warrant to search for contraband founded on probable cause implicitly carries with

it the limited authority to detain the occupants of the premises while a proper search is

conducted." 452 U.S. at 705, 711.

> In weighing whether the search in *Summers* was reasonable[,] the Court first found that detention represents only an incremental intrusion on personal liberty when the search of a home has been authorized by a valid warrant. … Against that interest, it balanced preventing flight in the event that incriminating evidence is found; minimizing the risk of harm to the officers; and facilitating the orderly completion of the search.
>
> In executing a search warrant officers may take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search. ... The test of reasonableness under the Fourth Amendment is an objective one. … Unreasonable actions include the use of excessive force or restraints that cause unnecessary pain or are imposed for a prolonged and unnecessary period of time.

*Los Angeles Cty., California v. Rettele*, 550 U.S. 609, 613–14 (2007) (citations and internal

marks omitted).

The Eleventh Circuit has not expressly determined whether or not the reasoning of

*Summers* categorically applies to the execution of arrest warrants, in addition to search

warrants. *See Gomez v. United States*, 601 F. App'x 841, 847 (11th Cir. 2015)

(unpublished) ("Whether the categorical detention exception recognized by *Summers* in a search warrant context applies with equal force to the execution of an arrest warrant is an open question in this Circuit."). However, the Court has noted that "[o]ther circuits have indicated that the *Summers* exception also applies in the context of the police executing arrest warrants." *Id*. at 847-48 (citing *United States v. Enslin,* 327 F.3d 788, 797 n. 32 (9th Cir. 2003) ("concluding that, '[a]lthough *Summers* involved a search pursuant to a search warrant rather than a consent search to execute an arrest warrant, much of the analysis remains applicable' and applying *Summers* in the arrest warrant context")[7]; *Cherrington v. Skeeter,* 344 F.3d 631, 638 (6th Cir. 2003) ("stating in dictum that "the police have the limited authority to briefly detain those on the scene, even wholly innocent bystanders, as they execute a search *or arrest warrant*'"")) (emphasis added by Eleventh Circuit) (footnotes omitted). Further, the Eleventh Circuit has indicated that "this Court has already cited and applied *Summers* to some extent to analyze what a police officer may lawfully do at the scene vis-à-vis detaining and controlling an innocent passenger during a traffic stop of a vehicle or a bystander on the sidewalk watching a fight." *Gomez*, 601 F. App'x at

---

[7] Subsequent to the *Gomez* decision, the Ninth Circuit declined to extend the categorical *Summers* search rule to arrests in *Sharp v. Cty. of Orange*, 871 F.3d 901 (9th Cir. 2017). However, the Court observed that

> [t]here will surely be circumstances when detention of persons on, or immediately near, the premises [during service of an arrest warrant] will be objectively reasonable. After all, entry into a home for the purpose of arresting an occupant can be a dangerous effort, and officers ought to have reasonable tools at their disposal to take command of the situation to protect their own safety and the safety of others. … Those tools might include detention of occupants to stabilize the situation while searching for the subject of an arrest warrant or conducting a lawful protective sweep of the premises.

*Id.* at 915 (citations omitted).

847 (citing *Hudson v. Hall*, 231 F.3d 1289, 1292 (11th Cir. 2000) (passenger during a traffic stop); *United States v. Clark*, 337 F.3d 1282, 1283 (11th Cir. 2003) (bystander to a fight)).[8] In those cases, the Court pointed out, it "has noted that, '[a]s the Supreme Court has recognized, a police officer performing his lawful duties may direct and control – to some extent – the movements and location of persons nearby, even persons that the officer may have no reason to suspect of wrongdoing.'" *Gomez*, 601 F. App'x at 847 (citing *Hudson*, 231 F.3d at 1297 (citing, *inter alia, Summers*, 452 U.S. at 702–03); and *Clark*, 337 F.3d at 1286–87 ("citing *Summers* and stating that the Supreme Court held that the risk of harm to officers is minimized when police officers exercise unquestioned command of

---

[8] In an unpublished decision, the Eleventh Circuit noted that,

> [F]or safety reasons, officers may ... briefly detain individuals about whom they have no individualized reasonable suspicion of criminal activity in the course of conducting a valid [investigatory] stop as to other related individuals," particularly when the officers are—as they were here—operating in "the known presence of firearms." *United States v. Lewis,* 674 F.3d 1298, 1306, 1309 (11th Cir. 2012); *see also Maryland v. Wilson,* 519 U.S. 408, 415, 117 S. Ct. 882, 886, 137 L.Ed.2d 41 (1997) (holding that an officer making a valid traffic stop of a driver "may order passengers to get out of the car pending completion of the stop" to ensure officer safety); *Michigan v. Summers,* 452 U.S. 692, 702–03, 101 S. Ct. 2587, 2594, 69 L.Ed.2d 340 (1981) (holding that officers conducting a valid search of a residence may detain an occupant without probable cause in order to minimize "[t]he risk of harm to both the police and the occupants"); *United States v. Clark,* 337 F.3d 1282, 1285 (11th Cir. 2003) ("[A]n officer may 'control' persons not suspected of wrongdoing if they are near a street encounter with persons reasonably suspected of criminal activity."); *Hudson v. Hall,* 231 F.3d 1289, 1297 (11th Cir. 2000) ("[A] police officer performing his lawful duties may direct and control—to some extent—the movements and location of persons nearby, even persons that the officer may have no reason to suspect of wrongdoing."); *State v. Cromatie,* 668 So.2d 1075, 1077 (Fla. 2d DCA 1996) (holding that an officer conducting a valid traffic stop could "detain all occupants of the car until he completed the search"); *Williams v. State,* 640 So. 2d 1206, 1208 (Fla. 2d DCA 1994) (holding that an officer who had probable cause to arrest a fleeing car occupant could briefly detain the other occupants while he gave chase because it was "a reasonable and necessary response to the exigent circumstances confronting the deputy that demanded immediate action").

*Bartley v. Kim's Enter. of Orlando, Inc.,* 568 F. App'x 827, 835–36 (11th Cir. 2014) (brackets in original).

the situation") (footnote and internal marks omitted). Based on these cases, the Court in *Gomez* decided that the officer involved there "lawfully and reasonably directed and controlled the movement of [the defendant] in conjunction with the safe and efficient execution of [an] arrest warrant," without "reach[ing] the issue of whether to adopt *Summers's* broad, categorical rule for all arrest-warrant cases," "decid[ing] only that, under the totality of the facts …, [the officer] did not act unlawfully in detaining [the defendant]." *Gomez*, 601 F. App'x at 849 (temporary detention of defendant outside his residence while police were executing an arrest warrant for his father at the residence was permissible, where defendant was in the immediate vicinity of the execution of the arrest warrant, and, prior to being detained, defendant engaged the officer verbally and unintentionally bumped into the officer).[9]

Similarly, this court concludes that, under the totality of the facts in this case, the officers reasonably seized defendant and briefly controlled his movement by directing him to take his hands out of his pocket, place them over his head, and crawl out of the doorway

---

[9]  *See also United States v. Ocean*, 564 F. App'x 765, 770 (6th Cir. 2014) ("this court held that the limited detention rule specified by the Supreme Court in *Summers* applies to the execution of arrest warrants in addition to search warrants.") (quoting *Cherrington*, 344 F.3d at 638 ("[T]he police have the limited authority to briefly detain those on the scene, even wholly innocent bystanders, as they execute a search or arrest warrant.") (internal citations omitted)); *United States v. Kinzalow*, 236 F. App'x 414, 418 (10th Cir. 2007) ("Where an individual is in an area immediately adjoining the arrestee, the individual may be placed in temporary protective detention even in the absence of probable cause or a reasonable suspicion that the individual poses a threat to officer safety."); *United States v. Maddox*, 388 F.3d 1356, 1363 (10th Cir. 2004) (citation omitted)("[T]he governmental interest in securing the area around [the arrestee] and protecting officers from potential danger is sufficient to justify the temporary detention of [the bystander]."); *Adams v. Springmeyer*, 17 F. Supp. 3d 478, 502 (W.D. Pa. 2014) ("Given that police officers executing arrest warrants frequently encounter the same dangers faced by those executing search warrants, the Court is convinced that *Summers* extends far enough to authorize the temporary detention of individuals residing within a house being entered under the authority of *Payton*."); *Anderson v. United States*, 107 F. Supp. 2d 191, 199 (E.D.N.Y. 2000) ("police are entitled to briefly detain individuals on the premises when a valid arrest warrant is executed.").

into the hall, in order to minimize the risk of harm to the officers and facilitate the orderly service of the arrest warrants. The officers were performing their lawful duties, and defendant was in the immediate vicinity of the area in which the officers intended to attempt to serve the warrants. *See Gomez*, 601 F. App'x at 847 ("Limiting the rule in *Summers* to the area in which an occupant poses a real threat to the safe and efficient execution of a search warrant ensures that the scope of the detention incident to a search is confined to its underlying justification.") (quoting *Bailey v. United States,* 568 U.S. 186, 201 (2013)). The warrants were for first degree robbery, which is a class A felony and a crime of violence under Alabama law; by definition, first degree robbery is a robbery committed by a person armed with a deadly weapon or dangerous instrument. S*ee* Ala. Code §§ 12-25-32(15)(a)(28), 13A-8-41(a)(1). A homicide which officers believed to be related to the robbery had occurred on the day following the robbery, and the officers could reasonably expect that the subjects of the arrest warrants, if found, might be armed. Defendant was observed in the doorway of the hotel room of the girlfriend of one of the suspects, and the officers had reason to be concerned that he also might be armed because they could not see his hands. In addition, at least one person – Nakita Rogers – was directly behind the defendant, and the officers could not immediately determine who else was in the room; it was eminently reasonable for them to cause the occupants to come out into the corridor in a controlled and orderly manner that was safe for everyone involved. *Cf. Gomez*, 601 F. App'x at 846 ("during a house search, the risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the

situation.") (citation and internal marks omitted). Thus, the court finds no Fourth Amendment violation in the initial seizure of the defendant.

The court now turns to the final actions of the officers during their encounter with the defendant which implicated the Fourth Amendment. The first of these is the seizure of the Para 9mm handgun that fell from defendant's waistband as he crawled into the hallway of the hotel. The second is defendant's detention and criminal background check after the discovery of the weapon.

### 4.  Seizure of Defendant's Weapon

The first of these actions need not detain us for long. The court has no hesitation in finding that, when defendant's handgun fell into the hallway from his waistband, and task force officer Onofry stepped on the gun and pulled it out of the defendant's reach, officers were constitutionally entitled to do so. However, this is not because the weapon could lawfully be seized under ordinary "plain view" analysis, as the government suggested during argument at the suppression hearing. It is well settled that "objects such as weapons or contraband found in a public place may be seized by the police without a warrant. The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, *assuming that there is probable cause to associate the property with criminal activity*." *Payton*, 445 U.S. at 587 (emphasis added). As the Supreme Court has explained,

> It is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. There are, moreover, two additional conditions that must be satisfied to justify the warrantless seizure. First, not only must the item be in plain view; its incriminating character must also be immediately apparent.

*Horton v. California*, 496 U.S. 128, 136 (1990) (citations and internal marks omitted). For the incriminating character of an item to be "immediately apparent," police must have probable cause to believe the object in plain view is contraband or evidence of a crime. *Minnesota v. Dickerson,* 508 U.S. 366, 374-75 (1993). Here, although the officers were lawfully present in the hallway, and the weapon appeared in plain view when it fell, its incriminating character was not immediately apparent. While the "immediately apparent" test "'merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband," and "[a] firearm that reasonably appears to be in the possession of a convicted felon qualifies as contraband—and is therefore subject to seizure under the plain view doctrine," *United States v. Folk*, 754 F.3d 905, 912 (11th Cir. 2014) (citation omitted), nothing on the record before the court indicates that officers knew or harbored a particularized suspicion that defendant was a convicted felon at the time that the weapon was seized. *United States v. Lewis*, 674 F.3d 1298, 1304–05 (11th Cir. 2012) ("it is by now well-settled law that the reasonable suspicion inquiry focuses on the information available to the officers at the time of the stop … not information that the officers might later discover.") (citations omitted).

However, in the context of the execution of a lawful search warrant – and also, this court concludes, during an attempt to execute a lawful arrest warrant, as in this case – the government's substantial interest in minimizing the risk of harm to law enforcement officers may justify the minimal intrusion on the defendant's Fourth Amendment interests occasioned by the seizure of a handgun. Reasonableness is always the touchstone of Fourth Amendment analysis, and "reasonableness is generally assessed by carefully weighing the

nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Cty. of Los Angeles, Calif. v. Mendez*, __ U.S. __, 137 S. Ct. 1539, 1546 (2017) (citation and internal marks omitted). Here, the "Fourth Amendment interest" upon which the government intruded was defendant's "possessory interest in the handgun." *United States v. Lewis*, 864 F.3d 937, 945 (8th Cir. 2017). At this stage of the encounter, however, the officers took possession of defendant's handgun only for the limited purpose of ensuring their safety while they attempted to serve the arrest warrants, and the weapon was not removed from defendant's person or his home, or even from the hotel room, but from the floor in a public hallway. Weighed against this slight intrusion on the defendant's rights is the government's substantial interest in minimizing the risk of harm to the officers and the public. *See id.* (*citing Bailey v. U.S.*, 568 U.S. 186, 194 (2013) (recognizing the government's interest in minimizing the risk of harm to officers), and *Terry*, 392 U.S. at 23 ("We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him.")); *see also Florida v. J.L.,* 529 U.S. 266, 272 (2000) ("Firearms are dangerous, and extraordinary dangers sometimes justify unusual precautions. Our decisions recognize the serious threat that armed criminals pose to public safety[.]"); *Pennsylvania v. Mimms,* 434 U.S. 106, 112 (1977) (*per curiam*) (observing that armed suspects "pose[ ] a serious and present danger to the safety of the officer."); *United States v. Gibson,* 64 F.3d 617, 624 (11th Cir. 1995) ("Law enforcement officers are at

greatest risk when dealing with potentially armed individuals because they are the first to confront this perilous and unpredictable situation."). The government's interest in minimizing the risk of harm to the officers was particularly heightened where, as here, the defendant did not immediately disclose the weapon, which instead fell accidentally from concealment on his person during the course of a rapidly developing situation, and did so within defendant's reach. Given the substantial governmental interest in officer safety, and the minimal intrusion on Fourth Amendment interests involved here, this court agrees with the Sixth, Eighth, and Tenth Circuits that – at least under these circumstances – a police officer who discovers a weapon in plain view may temporarily seize that weapon if a reasonable officer would believe, based on specific and articulable facts, that the weapon poses an immediate threat to officer or public safety. *See Lewis*, 864 F.3d at 947; *United States v. Gordon*, 741 F.3d 64, 71 (10th Cir. 2014); *United States v. Flores*, 193 F. App'x 597, 604–05 (6th Cir. 2006); *United States v. Harris*, 158 F. App'x 719, 725–26 (6th Cir. 2005); *United States v. Frederick*, 152 F. App'x 470, 472 (6th Cir. 2005); *United States v. Bishop*, 338 F.3d 623, 628 (6th Cir. 2003); *United States v. Robinson*, 756 F.2d 56, 60 (8th Cir. 1985); *United States v. Malachesen*, 597 F.2d 1232, 1234–35 (8th Cir. 1979). *See also Maryland v. Buie*, 494 U.S. 325, 333 (1990) ("In *Terry* and *Long* we were concerned with the immediate interest of the police officers in taking steps to assure themselves that the persons with whom they were dealing were not armed with, or able to gain immediate control of, a weapon that could unexpectedly and fatally be used against them. In the instant case, there is an analogous interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other

persons who are dangerous and who could unexpectedly launch an attack.") (arrest context); *United States v. Newsome*, 475 F.3d 1221, 1226 (11th Cir. 2007) ("the warrantless seizure of a gun is 'objectively reasonable' under the Fourth Amendment when there is a real concern for the safety of the officers present or the public at large.") (citation omitted); *United States v. Patel*, 2010 WL 742983, at *2 (M.D. Ala. Feb. 26, 2010), *aff'd,* 420 F. App'x 899 (11th Cir. 2011) ("During a legal search … the temporary seizure, unloading, and retention of a firearm by a responsible officer is a reasonable precaution to assure the safety of all persons on the premises of the search, and, alone, justifies securing the weapon without a warrant. … [T]he warrantless seizure of a gun is objectively reasonable under the Fourth Amendment when there is a real concern for the safety of the officers present or the public at large.") (citations, internal quotation marks and footnote omitted). Under the circumstances of this case, the court readily concludes that a reasonable officer engaged in attempting to serve arrest warrants would have believed, based on the facts set out above, that the defendant's weapon posed an immediate threat to officer or public safety, and that the officers were justified in seizing it.

   **5.   Detention and Criminal Background Check After the Discovery of the Weapon**

   After the weapon was seized, defendant was detained while the officers secured the two female occupants of the hotel room, whom the officers had also ordered to crawl to their position in the hall, and also while the officers entered the hotel room to look for anyone else who was the subject of the arrest warrants. The officers searched this room "for individuals only." Defendant's Ex. 13. During the search, Officers Byrd and Onofry

observed a black purse sitting on a chair on the right side of the room behind the door. *Id*. The purse was open, and they "could plainly see a pink handled firearm and a chrome firearm sitting in the purse." *Id*.  In addition, as he moved toward the rear of the room, Byrd "noticed a second purs[]e sitting on the left side of the hotel room that was also open." *Id*. According to Byrd, he could "plainly see the handle of a silver and black semi-automatic handgun sitting inside the purse." *Id*. After telling the other officers the locations of these firearms, and completing the search for other occupants in the room, Byrd was notified by another task force officer that Hines had been taken into custody in the Expedition that had left the hotel, but that Mock was not in the car. *Id*. Hines was found in possession of a Ruger P90 45 caliber firearm with an extended magazine. *Id*. In addition, Byrd was advised that the driver of the Expedition was armed with a Glock 9mm semi-automatic handgun, although he possessed a valid license to carry a concealed weapon. *Id*.

According to his report, at that time Sgt. Byrd began to identify the other occupants of the hotel room, and in this way, he learned defendant's identity. According to Byrd, "[i]t was found that Mastin was convicted of Robbery 1st [a felony] in 2010 and was currently on probation." *Id*. Defendant was arrested for the offense currently before the court. Mock was taken into custody later that night around 5:30 am, at a room in a different hotel that had been rented by his girlfriend.

With regard to the first portion of this period of defendant's detention, while the officers completed their search of the hotel room for any person named in the arrest warrants, the court finds no constitutional infirmity. The officers' authority under *Summers* in the arrest warrant context is a limited authority to direct and control the movement of

persons in conjunction with the safe and efficient execution of an arrest warrant. *Gomez*, 601 F. App'x at 847. Here, it was entirely reasonable for the officers to minimize the risk of harm to themselves or others, and to facilitate the orderly attempt to serve valid arrest warrants, by temporarily detaining the defendant and continuing to secure the premises while they completed their search for individuals named in the warrants. Officers' exercise of unquestioned command of the situation was particularly critical here, where defendant had just revealed himself to be armed, and where the officers also could reasonably expect that the subjects of the warrants themselves might be armed as well, if one or both were found in the hotel room. The Fourth Amendment does not compel an officer to permit individuals "at the scene of a crime, arrest, or investigation" to "move around in ways that could jeopardize his safety." *Brendlin v. California*, 551 U.S. 249, 258 (2007) (citations omitted).

Further, as to defendant's continued detention after this search concluded, the court finds that what initially was not a lawful *Terry* stop had ripened into such a stop. This was a situation in which the scales had tipped, and officers did have a reasonable suspicion that the defendant was involved in, or was about to be involved in, criminal activity. The court reaches this conclusion based on several factors. First, in contrast to when the officers first came onto the scene, defendant had proved himself to be armed with a 9mm handgun – a discovery not on its own sufficient to justify detention in a concealed carry state, *see United States v. Ubiles*, 224 F.3d 213, 217–18 (3d Cir. 2000), *as amended* (Sept. 28, 2000), but nevertheless not an inconsiderable factor in the totality of the circumstances. Second, the fact that defendant's hands were in his pocket and, thus, near his waistband, when officers

told him to raise them and get on the ground had acquired additional significance, once officers became aware that defendant actually did have a weapon in his waistband. *See United States v. Durrah*, 2009 WL 10688823, at *12 (N.D. Ga. May 11, 2009) ("Furtive movements or hand gestures, when undertaken in response to the presence of police, may be grounds for reasonable suspicion and fear, justifying a *Terry* stop and frisk.") (citations and internal marks omitted); *see also United States v. Reed*, 402 F. App'x 413, 416 (11th Cir. 2010) ("furtive" eye, hand and body movements and positioning considered in the totality of the circumstances). Third, officers searching the hotel room for the subjects of the arrest warrants had observed three more handguns within the open purses of the two female occupants of the room. Finally – immediately after the room search concluded, but before the three occupants of the hotel room had been identified – officers learned that Hines had been apprehended, and that both he and the driver of the Expedition had also been armed with handguns.

This information, and the reasonable inferences that could be drawn from it, gave officers the required minimal level of objective justification for an investigatory stop of the defendant under the totality of the circumstances. What had begun merely as a possible association between defendant and Hines and/or Mock – which might have been momentary, random, or innocent – had become a proven connection between the defendant and a man whom officers believed to be a violent fugitive, wanted both for a recent first degree robbery, and for questioning on a related murder that had occurred just the day before. Indeed, officers now knew for certain that Hines actually had been present in the hotel room with the defendant only a short time before. *Cf. United States v. Bell,* 762 F.2d

495, 498–99 (6th Cir.1985) ("[W]hile the fact of companionship did not of itself justify [a] frisk ..., it is not irrelevant to the mix that should be considered in determining whether the agent's actions were justified.") (citation and internal quotation marks omitted). Because of Hines' confirmed presence there, the officers also had further reason to believe that the registration of the room in Hines' girlfriend's name very likely was indeed for the purpose of hiding Hines. Further, not only had defendant himself been found to be in possession of a weapon, but officers had learned that the whole group was heavily armed, with a total of six weapons[10] among the six people who were in the hotel room just before Hines and the driver left and the officers approached. In addition, four of those weapons apparently were being kept at the ready in the room; defendant's handgun had been placed in his waistband, and the guns belonging to the women were being maintained in open purses. Meanwhile, Hines and the driver were carrying their weapons with them as well, perhaps also so that those weapons could also be ready for use. Officers could also reasonably assume, because some of the group had been left at the room, and Rogers had not checked out, that both Hines and the defendant (if the latter actually were leaving when the door opened, and had not simply heard the officers setting up in the hallway) intended to return to the room that night and were not in the process of dispersing.[11] These specific and articulable facts,

---

[10] The January 21, 2016, memorandum by Officer Byrd lists these weapons as follows: a Para 9mm handgun (Mastin); a Ruger P90 45 caliber handgun (Hines); a Glock 26 9mm handgun (in the possession of John Casrell, the driver of the Expedition); a Bersa Thunder 380 caliber handgun (Nakita Rogers); and a Ruger LCP 380 caliber handgun and a Phoenix Arms Raven 25 caliber handgun (Sabrina Rogers). *See* Defendant's Ex. 13.

[11] In fact, defendant's motion to suppress alleged that he intended to stay at the hotel that night, although no evidence was presented to this effect at the suppression hearing. *See* Doc. 57 at 4 (defendant "was [at the hotel] with his cousins Nakita Rogers and Sabrina Rogers and also his girlfriend, Latifah Warren, who

considered in the totality of the circumstances, would warrant the officers in the reasonable suspicion that defendant, along with the other armed individuals, was participating in, or preparing to participate in, any of a number of possible crimes: harboring Hines as a fugitive and hindering his prosecution, resisting Hines' arrest, defending Hines from possible retribution as a result of the recent robbery or the related murder, exacting revenge upon persons involved in the swearing out of the warrants, receiving or selling the stolen property, or carrying out another robbery. Of course, officers are not required to be correct in arriving at such suspicions; the likelihood of any of these criminal activities "need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard," *United States v. Bautista-Silva*, 567 F.3d 1266, 1272 (11th Cir. 2009). *See also Heien v. North Carolina*, __ U.S. __, 135 S. Ct. 530, 536 (2014) ("Reasonable suspicion arises from the combination of an officer's understanding of the facts and his understanding of the relevant law. The officer may be reasonably mistaken on either ground."); *United States v. Scott*, 693 F. App'x 835, 836 (11th Cir. 2017) (same). Such suspicions simply must be reasonable. The Supreme Court has made it clear that "[t]o be reasonable is not to be perfect[.]" *Heien*, __ U.S. __, 135 S. Ct. at 536.

The court is well aware, in setting out above the articulable facts and inferences and the possible criminal activities which support a reasonable suspicion under *Terry* in this case, that neither Officer Byrd (in testimony), nor the Assistant U.S. Attorney (in argument), actually articulated many of these facts and inferences, or proposed any of the

---

was the third black female identified by the officers. They had made plans to spend the night in the room[,] play card games and go to the indoor pool.").

particular criminal activities outlined above – or, for that matter, actually contended that the officers arrived at a reasonable suspicion on this specific basis. This rather significant omission cannot be commended as good practice, but, again, the error is not fatal under controlling precedent. *Terry* refers to "articulable" rather than "articulated" facts, to which the officer simply must be able to point, *Terry*, 392 U.S. at 21,[12] and the Supreme Court and the Eleventh Circuit have clearly stated that the standard that the court must apply is an objective one. *See id.* at 21-22 (In assessing reasonable suspicion, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?") (citation and internal marks omitted); *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008) ("[T]he issue is not whether the particular officer involved actually and subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion objectively existed to justify the investigatory stop.") (citation and internal marks omitted); *United States v. Nunez,* 455 F.3d 1223, 1226 (11th Cir. 2006) ("[W]hether reasonable suspicion existed at the time of the investigatory stop is a question of law to be determined ultimately by judges, not policemen .... [T]he question ... is not whether a specific arresting officer ... actually and subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion objectively existed to justify such a search.") (citation and internal marks

---

[12] *But see Illinois v. Wardlow*, 528 U.S. 119, 140 (2000) ("It is the State's burden to articulate facts sufficient to support reasonable suspicion.") (Stevens, J., joined by Souter, J., Ginsburg, J., and Breyer, J., concurring in part and dissenting in part) (citations omitted).

omitted); *Justice v. Peachtree City*, 961 F.2d 188, 193 (11th Cir. 1992) ("it is for the court ... ultimately to resolve whether, under the facts available to the law enforcement officer, the legal standard for reasonable suspicion was met.") (citation and internal marks omitted).[13] Under the totality of the circumstances discussed above, the court concludes that the facts available to the officers at the moment of the seizure warranted a person of reasonable caution in the belief that defendant's detention was appropriate, and that, given the circumstances, reasonable suspicion objectively existed to justify the investigatory stop.

### 6.  Identification and computer check

The remaining question before the court relating to defendant's detention is whether or not officers lawfully identified the defendant and thereafter ran the computer check which indicated that he had been convicted of robbery first in 2010 and was currently on probation – and therefore, that he was prohibited by law from possessing a firearm.

With regard to the identification of the defendant, the Supreme Court has "concluded that if there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information." *Hayes v. Florida*, 470 U.S. 811, at 816 (1985). The Court has determined that "it is well established that an officer may ask a suspect to identify himself in the course

---

[13] *See also United States v. Brown*, 232 F.3d 589, 594 (7th Cir. 2000) ("It is important to remember that we are not limited to what the stopping officer says or to evidence of his subjective rationale; rather, we look to the record as a whole to determine what facts were known to the officer and then consider whether a reasonable officer in those circumstances would have been suspicious.") (citation and internal marks omitted).

of a *Terry* stop[.]" *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty.*, 542 U.S. 177, 186 (2004); *see also id.* ("questions concerning a suspect's identity are a routine and accepted part of many *Terry* stops."). Thus, the court finds no error in the identification.

As to the computer check for warrants and criminal history run by officers which established that defendant was a felon in possession of a weapon, the *Hiibel* Court implicitly acknowledged that using a suspect's identity to conduct such a check during a stop serves important government interests. *See id.* ("Obtaining a suspect's name in the course of a *Terry* stop serves important government interests. Knowledge of identity may inform an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder. On the other hand, knowing identity may help clear a suspect and allow the police to concentrate their efforts elsewhere."). Further, under some circumstances, an arrest history indicating that a suspect is "a convicted felon, and that he had been arrested for numerous felonies, including burglary, homicide, and weapons violations" may justify an officer's call for backup out of concern for his safety. *United States v. Lester*, 477 F. App'x 697, 699 (11th Cir. 2012). By "determining whether a detained motorist has a criminal record or outstanding warrants, an officer will be better appri[s]ed of whether the detained motorist might engage in violent activity during the stop." *United States v. Burleson*, 657 F.3d 1040, 1046 (10th Cir. 2011) (citation and internal marks omitted).

In the traffic context, "[i]t is well established that officers conducting a traffic stop may take such steps as [are] reasonably necessary to protect their personal safety[,]" that they "may prolong the detention to investigate the driver's license and the vehicle registration," and that they "may do so by requesting a computer check." *United States v.*

*Purcell*, 236 F.3d 1274, 1277–78 (11th Cir. 2001) (citations and internal marks omitted); *see also Rodriguez v. United States*, __U.S.__, 135 S. Ct. 1609, 1615 (2015) ("Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop. … Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.") (citations and internal marks omitted). "Many courts have recognized that knowledge of the criminal histories of a vehicle's occupants will often be relevant to that safety." *Purcell*, 236 F.3d at 1278 (citations omitted); *see also United States v. Young*, 707 F.3d 598, 606 (6th Cir. 2012) ("[S]ome of our sister circuits have expressly held that officers do not exceed the permissible scope of a *Terry* stop by running a warrant check, even when the warrant check is unrelated to the crime suspected. ... This procedure may help clear a person's name or may give the officers important information about the suspect. ... We find this persuasive and, accordingly, hold that the officers here did not exceed the reasonable scope of a *Terry* stop by running a warrant check.") (citations omitted); *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999) ("Once the police had validly detained [the suspect], plainly they were entitled under the decisional law to conduct a variety of checks on the driver and his car, including questioning the driver about the traffic violation, requesting consent to search the car, *and* running a computer check for outstanding warrants.") (citations omitted). However, "as in most issues relating to the constitutionality of a traffic stop, … bright-line rules are inadvisable. The Supreme Court has 'long held that the 'touchstone of the Fourth Amendment is reasonableness.' … Under some circumstances a criminal record

request might lengthen a traffic stop beyond what is reasonable in a particular case." *Purcell*, 236 F.3d at 1278–79; *see also Rodriguez*, __U.S.__, 135 S. Ct. at 1615 (2015) ("An officer … may conduct certain unrelated checks during an otherwise lawful traffic stop. But … he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.").

Although "[t]raffic stops are especially fraught with danger to police officers," *Rodriguez*, __U.S. __, 135 S. Ct. at 1616 (citation and internal marks omitted), officer safety "'is just as strongly implicated where the individual being detained for a short period of time is on foot, rather than in an automobile," and thus, "[a]n officer detaining a pedestrian has an equally strong interest in knowing whether that individual has a violent past or is currently wanted on outstanding warrants." *Burleson*, 657 F.3d at 1046 (citation omitted). Also, "the pedestrian's interest is no more robust merely because a short detention occurs while traversing on foot." *Id.* (citation and internal marks omitted). "'[P]ermitting a warrants check during a *Terry* stop on the street also promotes the strong government interest in solving crimes and bringing offenders to justice." *Id.* (citation and internal marks omitted). "'[A]n identity's utility in informing an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder, would be non-existent without the ability to use the identity to run a criminal background check." *Id.* at 1046-47 (citation omitted). In sum, "the same rationale … as to the permissibility of warrants checks in the motorist context applies with equal force in the pedestrian context." *Id.* at 1047.

In the instant case, the risk of violence from defendant during the stop was substantially reduced by the presence in the hallway of five to eight Task force officers, all

of whom the court presumes to have been very well armed. On the other hand, two other occupants of the room were also present – both of whom had been found to have handguns in the hotel room – and those guns had not yet been collected by the officers at the time that defendant's criminal history was checked. The hotel hallway was a public corridor, which could have been entered at any time by bystanders or hotel staff. Further, Hines and Mock both had violent criminal histories, including a possible connection to a murder occurring just the day before, and while Hines had been apprehended by this time, officers knew that Mock remained at large. Given his association with Hines, Mock could have arrived at the hotel room at any moment. In addition, defendant's detention – even in handcuffs, if that was the case (no evidence was presented on this point) – would not entirely prevent him from charging the officers, attempting to run, seeking to obtain a weapon either from one of the officers or from the hotel room, or joining others such as the two females or Mock in resisting if the opportunity arose. *See United States v. Clark*, 2016 WL 3945131, at *3 (D. Me. July 19, 2016), *aff'd,* 2016 WL 4532062 (D. Me. Aug. 29, 2016) ("Handcuffing a suspect reduces, but does not eliminate, officer safety concerns. A handcuffed suspect can still reach for a weapon in his or her waistband or pockets, charge an officer, or sometimes even escape from handcuffs."). Further, if defendant had been released with his handgun, he might have been able to join Mock and assist him in avoiding or resisting arrest, or in retaliating against those involved in obtaining the warrants, if he were so inclined. Thus, the court concludes that it was objectively reasonable under these specific circumstances for officers to take the minimally intrusive step of running defendant's criminal history for the purpose of assessing the risk that he might engage in

41

violent behavior during the stop.[14] *Purcell*, 236 F.3d at 1278 ("The request for criminal histories as part of a routine computer check is justified for officer safety. It is both reasonable and minimally intrusive."); *see also United States v. Cone*, 868 F.3d 1150, 1153 (10th Cir. 2017) ("[R]unning a computer check of a driver's criminal history is justifiable as a negligibly burdensome inquiry useful for officer safety …") (citation and internal marks omitted).[15]

### 7.  Defendant's Post-arrest Statements

Having concluded that the weapon seized from defendant in this case is not due to be suppressed, the court must address whether any additional evidence warrants suppression. Defendant's motion, which is styled as a motion to suppress "tangible evidence" (Doc. 57), asks the court to "issue an [o]rder suppressing all tangible evidence, in addition to any derivative evidence (or "fruit") of those items and statements, obtained by the United States, as a result of the unlawful search … ." *Id.* at 1. Defendant "prays that [his] motion be granted and the firearm at issue in this case[,] along with any other tangible

---

[14] Once again, the court is aware that neither the officers nor the government actually articulated the officer safety concerns addressed above. Sgt. Byrd indicated only that the computer check was run for "for warrants and to make sure defendant was not wanted," and did not explain why. The court has again applied an objective standard.

[15] Nothing in the record establishes how long the stop may have been prolonged, if at all, to check defendant's criminal history. Officer Byrd's memorandum seems to indicate that the computer check occurred immediately after the hotel room occupants were identified, but before the Criminal Investigations Division was contacted, the weapons actually were collected from the room, and the officers attempted to seek consent to search from the female occupants. Defendant's Ex. 13. The court cannot conclude, on the evidence before it, that the stop was unreasonably prolonged, or that the officers' reasonable suspicion for the investigatory *Terry* stop had been dispelled or had evaporated at the time of the computer check. *Purcell*, 236 F.3d 1279 ("So long as the computer check does not prolong the traffic stop beyond a reasonable amount of time under the circumstances of the stop, the inclusion of a request for criminal histories does not constitute a Fourth Amendment violation.").

evidence[,] be suppressed as fruit of the illegal search." *Id.* at 6. Defendant does not identify or otherwise describe any such "tangible evidence," with the exception of the firearm.

At the suppression hearing, the court asked defense counsel if the evidence to be suppressed was "just the weapon" or if there were "any other evidence."  Defense counsel responded as follows: "[O]ur contention would be primarily the weapon, but the mere fact of entering the hotel room also led to other derivative evidence[,] including statements at the police station. So[,] we would say the main[,] fundamental problem of violating the [Fourth] Amendment at the hotel room primarily led to the need to suppress the gun but [also] the derivative evidence." The court asked defense counsel who it was that made statements at the police station. Counsel responded that defendant "gave a statement on January 20th, 2016, at CID.[16] And then on January 21st, 2016, at the county."

During the evidentiary hearing, defense counsel had the opportunity to present evidence and witnesses, cross-examine witnesses, and offer oral argument. However, at no time during the hearing did counsel explain why defendant's two statements should be suppressed, with the exception of his reference to these as "derivative." As the record now stands, the court knows nothing about these statements, except that they were made on January 20 and 21, 2016, at "CID" and "the county." The court has not been informed of the time at which the statements were given, how much time elapsed between the seizure of the weapon and the statements, whether the statements were made during an interview by police, whether the defendant was in custody when he made the statements, whether the

---

[16] This acronym commonly stands for "Criminal Investigation Division."

defendant was Mirandized prior to making the statements, whether the statements were voluntary, or even whether the statements were incriminating. Furthermore, defendant has made no specific argument whatsoever as to why the statements were derivative – or the "fruit" – of the seizure or whether they somehow stood alone.

The court acknowledges the Supreme Court's holding in *Wong Sun v. United States*, 371 U.S. 471, 485 (1963), in which the Court applied the exclusionary rule to verbal statements, finding that "verbal evidence which derives … immediately from an unlawful entry and an unauthorized arrest … is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." (footnote and citation omitted). However, the court has no argument before it even suggesting that defendant's statements "derived immediately" from the officers' seizure in this case, nor has it concluded that this seizure was unlawful. Accordingly, defendant has failed to meet his burden to present the court with evidence and argument to support a finding that the statements are due to be suppressed. *See United States v. Edwards*, 563 F. Supp. 2d 977, 994 (D. Minn. 2008) ("At the end of the day, as the moving party, at a minimum it is defendant's burden to come forth with some evidence and argument to support his position that evidence, statements or a witness identification should be suppressed."); *see also United States v. Diezel*, 608 F.2d 204, 207 (5th Cir. 1979) ("As this Court said in *United States v. Evans*, … 'The burden is on the movant to make specific factual allegations of illegality, to produce evidence, and to persuade the court that the evidence should be suppressed.'") (citation omitted); *United States de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977) ("It is well established that the burdens of production and persuasion generally rest upon the movant in a suppression

hearing.").[17] Accordingly, to the extent that the motion can be construed as seeking to suppress defendant's statements, it is due to be denied.

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that defendant's motion to suppress (Doc. 57) be DENIED.  It is further

ORDERED that **on or before January 16, 2018**, the parties may file an objection to the Recommendation.  Any objection filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party filing the objection objects.  Frivolous, conclusive or general objections will not be considered by the District Court.

Failure to file a written objection to the Magistrate Judge's findings and recommendations under 28 U.S.C. §636(b)(1) shall bar a *de novo* determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of a party to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. 11th Cir. R. 3-1; *Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE, on this the 2nd day of January, 2018.

/s/ Susan Russ Walker
Susan Russ Walker
United States Magistrate Judge

---

[17] "In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981." *Tech. Training Assocs., Inc. v. Buccaneers Ltd. P'ship*, 874 F.3d 692, 697 n.2 (11th Cir. 2017).